**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re | **Chapter 11 Case No.** |
| **LIONEL L.L.C., et al.,** | **04-_____ (    )** |
| **Debtors.** | **(Jointly Administered)** |

**AFFIDAVIT OF SCOTT TURKINGTON PURSUANT TO LOCAL BANKRUPTCY
RULE 1007-2 IN SUPPORT OF CHAPTER 11 PETITIONS**

1.       I am the Chief Financial Officer of Lionel L.L.C. ("Lionel") and Liontech

Company ("Liontech"), the above-captioned debtors and debtors-in-possession (together, the

"Company" or the "Debtors").  My duties include directing the overall financial plans and

accounting practices of the Company; overseeing the Company's treasury, accounting, budget,

tax and audit activities; as well as overseeing the Company's financial and accounting system

controls and standards and ensuring timely financial and statistical reports for management and

ownership.  Based on the daily performance of my duties, I am familiar with the Debtors'

operations, business affairs, books and records and financial condition.

2.       I submit this Affidavit pursuant to Local Bankruptcy Rule 1007-2 in

connection with the voluntary chapter 11 petitions and first-day motions of the Debtors in the

above-captioned chapter 11 cases.  All facts set forth in this Affidavit are based on my personal

knowledge, upon information supplied to me by others at the Debtors, upon information supplied

to me by counsel to the Debtors, upon my review of relevant documents, or upon my opinion

based on my experience and knowledge with respect to the Debtors' operations, financial

condition and related business issues.  If I were called upon to testify, I could and would testify

competently to the facts set forth herein, and am authorized to submit this Affidavit on behalf of

the Debtors.

A.      **The Debtors' Business**

3.      On the date hereof (the "Commencement Date"), each of the Debtors

commenced a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code").  The Debtors continue to operate their businesses and manage their properties as debtors

in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      Lionel L.L.C. ("Lionel") is organized as a New York limited liability

company.  The membership interest in Lionel is owned 75% by Train Acquisition LLC (which is

a holding company owned by the estate of Martin Davis), 20% by Neil Young, and 5% by

Richard Kughn.  Liontech Company is a Michigan "C" corporation and a wholly-owned

subsidiary of Lionel.

5.      Established in 1900, Lionel (or the "Company") has been the nation's

leading manufacturer and marketer of model trains for the last 104 years.  Lionel™ is an

American icon with the most recognized brand in the model train industry and is synonymous in

consumers' minds with electric trains.  Headquartered in Chesterfield, Michigan (outside of

Detroit), the Company offers a line of more than 600 stock keeping units ("SKU's") of model

trains and accessories made from an inventory of more than 27,000 proprietary tools and dies.

Lionel distributes its products through approximately 110 specialty retail and mail order houses

and 15 wholesalers that in turn sell to approximately 1,500 hobby shops, as well as through

direct sales via its Century and Railroader clubs and on its e-commerce site.

i.      **Product Lines**

6.      Lionel's product offering is exclusively model train products, including

steam and diesel engines, rolling stock, operating and non-operating accessories, track,

transformers and electronic control devices.  Lionel competes primarily within the O gauge

segment of the model train market (gauge refers to the size of the train and the distance between the rails). Having sold over 50 million trains to date, Lionel is the clear leader in this segment and the only collectible brand in the category. The Company's trains are equipped with Trainmaster Command Control™ ("TMCC") and RailSounds™, proprietary technology developed by the Company. TMCC is a digital control system that delivers wireless signals from a hand held remote control directly to the train. In addition to the freedom to control the train remotely, from any point near the layout, TMCC allows the operator to control up to 99 trains and 9 accessories simultaneously. The Company's locomotives can also be controlled conventionally using a transformer. Railsounds is a digitally synthesized audio system that provides realistic sound broadcast from the train.

ii.      **Customers and Consumers**

7.      Lionel has 3 types of consumers: collectors, first-time buyers and operators. Collectors are hobbyists who purchase Lionel trains and retain them for their increase in value. A large secondary market exists in which Lionel trains are sold and purchased. First time buyers include, among others, grandparents and parents who grew up with Lionel trains and who purchase train sets for their grandchildren and children. Unlike video games, building and running a train layout is an activity that involves great parent/child interaction. Operators are hobbyists who actively run their trains.

8.      The intensity with which train enthusiasts embrace their hobby is evidenced by the large number of consumer clubs with large membership rosters. Several of the largest clubs, the Lionel Operating Trains Society (LOTS) and the Lionel Collectors Club of America (LCCA) are devoted specifically to Lionel. Other large clubs include the Train Collectors Association (TCA) and the Toy Train Operators Society (TTOS). Lionel enjoys

mutually beneficial relationships with all of the major clubs, and in fact derives revenues from the sale of custom decorated train products to the club organizations.

### iii.    Distribution Channels

9.    As indicated above, the Company distributes most of its products through approximately 110 specialty retail stores and 15 wholesalers. Retailers operate a traditional store front and many of them have a substantial mail order business with customers across the country. Wholesalers, most of whom carry other hobby lines in addition to trains, sell to approximately 1,500 indirect dealers. These dealers are primarily hobby shops that sell to the end-user and serve as "service stations" to make minor repairs to the products. They are subject to Lionel's dealer agreement, which requires certain quality and service standards. In addition to its hobby channel, the Company sells product direct to the consumer through its popular Century Club and Railroader Club, as well as to premium accounts and catalog houses such as Nabisco and the Herrington Catalog.

### iv.    Licensing

10.    Lionel is the only manufacturer in the model train industry with the brand equity to license its name to non-train marketers successfully. The largest licensee, Hallmark, accounts for nearly half of the license income through sales of Lionel-branded Christmas ornaments and related items.

### v.    Operations

11.    Historically, the Debtors manufactured their products in a facility located near its headquarters in Chesterfield, Michigan. Due to competition with high quality, lower priced merchandise manufactured in Asia, Lionel terminated its domestic manufacturing and moved the work to suppliers in Asia. By the end of 2001, Lionel's Asian suppliers were sufficiently developed to absorb all design and production.

vi. **Facilities and Tooling Inventory**

12.     The Company owns and occupies two facilities in the Detroit suburb of

Chesterfield, Michigan.  A 48,000 SF office serves as the Company's corporate headquarters and

houses most of the 100 salaried personnel, and a 148,000 SF distribution facility that previously

housed production operations is now used for shipping, receiving and warehousing and also

houses Lionel's Consumer Services group.

13.     One of Lionel's most significant tangible assets is its tooling inventory.  It

owns all of the existing molds, tools, and dies produced by the Company and its predecessors.

This inventory consists of more than 27,000 injection and die-cast molds, metal forming and

stamping tools, decorating dies, masks, and assembly fixtures.  The proprietary tooling inventory

allows the Company to introduce many products at a low marginal cost.  Based on its extensive

inventory of tools and dies, Lionel is able to create new products from existing tooling based on

inexpensive changes in decoration and "roadnames."  Although some of the tooling dates back to

the 1940s and 1950s, a significant portion of the Company's annual revenue is from products

made from this tooling inventory, which are highly desired by the consumer as authentic replicas

of iconic Lionel products.  Most of the value of this tooling inventory is not reflected on the

balance sheet, since tools are amortized over a three-year life.  The value of this extensive

tooling inventory is reflected in both the flexibility it affords the manufacturing process, as well

as its uniqueness in producing collectible items.

vii. **Prepetition Capital Structure**

14.     Lionel is a party to a Revolving Credit, Term Loan and Security

Agreement dated as of March 27, 2003 (the "Prepetition Credit Agreement") with PNC Bank,

National Association as agent and lender, and certain other financial institutions party thereto as

lenders.  The Prepetition Credit Agreement provided Lionel with a revolving credit line up to a

maximum amount of $25.8 million and a term loan in the amount of $9.2 million. These

obligations are secured by first priority liens on and security interests in substantially all of the

Debtors' assets, including, property, inventory, goodwill, and accounts receivables.

Furthermore, the obligations under the Prepetition Credit Agreement are further supported by

$8.5 million in cash collateral deposits and letters of credit pledged by the owners of Lionel.

15.     Lionel is also a party to a Note Purchase and Security Agreement dated as

of March 27, 2003 (the "Note Purchase Agreement") with Guggenheim Investment

Management, as agent. Under the Note Purchase Agreement, $7 million in principal amount of

senior notes (the "Senior Notes") and $5 million in principal amount of junior notes are issued

and outstanding. The senior secured notes are secured by a second lien on the collateral securing

the Prepetition Credit Agreement, and benefit from a $7 million guaranty issued by the holders

of the membership interests in Lionel (the "Guaranty"). The lenders under the Prepetition Credit

Agreement are also beneficiaries of the Guaranty.

### viii.    Litigation with Mike's Train House

(1)    Nature of the case

16.     One of Lionel's main competitors is Mike's Train House ("MTH"). In

2000, MTH sued Lionel in the United States District Court for the Eastern District of Michigan,

accusing Lionel, among other things, of violating the Michigan Uniform Trade Secrets Act

("MUTSA"), Mich. Comp. Laws § 445.1901 et seq. MTH alleged that agents of Lionel's co-

defendant Korea Brass—a Korean company with which Lionel contracted to design and

manufacture its model trains—stole confidential design drawings and scheduling information

from MTH's Korean supplier, Samhongsa, and then used that information to design and build

trains for Lionel. MTH claimed that Lionel knew or should have known that its trade secrets

were being incorporated into Lionel products, and contended that it had experienced both lost

sales and an erosion of its overall profitability as a result of the misconduct. Lionel strongly disputed all of MTH's allegations against it.

(2)       Status of the litigation

17.       On June 7, 2004, the jury returned a verdict in favor of MTH, finding: (1) that MTH was "the owner or co-owner of information that qualified as a trade secret or secrets"; (2) that Korea Brass and its U.S. agent Yoo Chan Yang had "improperly acquire[d], disclos[ed] to Lionel, or use[d] any or all of this information"; (3) that Lionel had "improperly acquire[d] or use[d] any or all of this information"; (4) that the "improper use of this information [had] cause[d] injury to [MTH's] business or other legitimate interests"; and (5) that the defendants' actions had been "willful and malicious." The jury also found that MTH had suffered past lost profits of $11,978,887, that it would suffer future lost profits of $13,794,518, that Lionel had been unjustly enriched in the amount of $12,834,820, and that Korea Brass and Yang had been unjustly enriched in the amount of $2,167,440.

18.       Following the return of the jury verdict the parties submitted pre-judgment briefs addressing Lionel's motions for judgment as a matter of law and/or a new trial and on MTH's motion for permanent injunctive relief. The Court held a hearing on these briefs on October 19, 2004. On November 1, 2004, the District Court denied Lionel's motion for judgment as a matter of law and/or a new trial and granted MTH's motion for permanent injunctive relief. On November 3, 2004, the District Court entered judgment in the amount of the jury's verdict.

19.       Lionel believes that it has both substantive and procedural grounds for appeal of the judgment and the injunctive relief. As such, Lionel intends to appeal both the verdict and the injunction to the United States Court of Appeals for the Sixth Circuit (the "Sixth Circuit").

ix.   **Events Leading to Chapter 11 Filing**

20.    As stated above, Lionel believes that both the verdict and the injunctive relief are wrong and intends to file an appeal of both to the Sixth Circuit.  However, Lionel does not have sufficient liquidity or financial strength to post a bond to stay enforcement of the judgment pending appeal.  Furthermore, the entry of the judgment is a default under the Debtors' financing facilities, enabling the Debtors' prepetition lenders to exercise their remedies.  Moreover, the Debtors' customers and suppliers are understandably concerned over the effect of the judgment.  In order to provide protection for precipitous efforts to collect on the judgment (including, without limitation, through attachment and possibly foreclosure), and to provide suppliers and customers with a degree of certainty while the Company pursues its appeal, the Debtors have commenced these chapter 11 cases.  The Debtors believe that this action will allow the Company to obtain the financing required to stabilize its businesses and to preserve its going concern value for the benefit of all creditors and other parties in interest.

(a)    Prior Trustees or Creditor Committees

21.    To the best of my knowledge, neither of the Debtors have ever commenced a case under chapter 7 , 11 or 13 of the Bankruptcy Code.[1]

(b)    Existing Creditor Committees

22.    To the best of my knowledge, no creditor committees were formed by the Debtors' creditors prior to the commencement of these chapter 11 cases.

(c)    Twenty Largest Unsecured Claims (excluding insiders)

23.    Lionel.  A list of Lionel's twenty largest unsecured claims is attached

---

[1] Although Lionel has never been a chapter 11 debtor before, Lionel purchased the rights to the "Lionel" name and much of its tool and die inventory from Lionel Corporation, which was a chapter 11 debtor in the Bankruptcy Court in the Southern District of New York.

hereto as Schedule A.

24. Liontech. Liontech is a wholly-owned subsidiary of Lionel that owns all of the Debtors' intellectual property. Liontech has no unsecured creditors.

(d) Five Largest Secured Creditors

25. The Debtors' largest secured creditors are listed on Schedule B annexed hereto.

(e) Summary of Debtors' Assets and Liabilities

26. The Debtors' assets are comprised of their inventory of model trains, tool and die equipment, accounts receivable, real property, intellectual property and goodwill.

27. The inventory is composed of more than 600 SKU's, including steam and diesel engines, rolling stock, operating and non-operating accessories, track, transformers and electronic control devices.

28. The Debtors' tool and die equipment (the "Tooling Assets") consists of more than 27,000 injection and die-cast molds, metal forming and stamping tools, decorating dies, masks and assembly fixtures. The Tooling Assets were produced by the Debtors and their predecessors. Most of the value of the Tooling Assets is recorded on the Debtors' balance sheet as goodwill because the equipment is amortized over a three year life and much of the equipment dates back to the 1940s and 1950s. In an appraisal done in 1995, the Tooling Assets were valued at $20.3 million. Since that appraisal the Debtors have spent an additional $28 million on new Tooling Assets. Much of the Tooling Assets are located with the Debtors' contractors in Korea and China.

29. As described above, the Debtors own two facilities in Chesterfield, Michigan. There is no purchase money mortgage on these facilities, but both buildings have been pledged as collateral to secure the Debtors' Prepetition Credit Facility and the Senior Notes.

30.     As described above, the Debtors developed and own the TMCC and Railsounds technology.

31.     Lionel's liabilities are principally composed of (i) the obligations outstanding under the Prepetition Credit Agreement, which as of the Commencement Date consisted of approximately $25,800,000 in revolving loans and $6,825,000 in term loans, plus accrued and unpaid interest, (ii) the obligations outstanding under the Note Purchase Agreement, which as of the Commencement Date was approximately $12,568,000 (inclusive of accrued and unpaid interest), (iii) past due accounts payable owed to Sanda Kan Industrial, Ltd., Lionel's principal manufacturer of inventory, in the amount of $6,685,000 (including accrued interest) and (iv) various other trade accounts payable of lesser amounts.

32.     Liontech is liable as a guarantor of Lionel's obligations under the Prepetition Credit Agreement and the Note Purchase Agreement.

33.     Attached hereto as <u>Schedule C</u> is a balance sheet dated October 31, 2004 for the Debtors.

(f)     <u>Classes and Shares of Publicly Held Stock, Debentures or other Securities and the Number of Holders Thereof</u>

34.     Neither of the Debtors has any outstanding public stock, debentures or securities.  Lionel is privately owned by three investors and Liontech is a wholly-owned subsidiary of Lionel.

(g)     <u>Property in Possession of Custodian, Public Officer, Mortgagee, Pledgee, Assignee of Rents, or Secured Creditor or Agent for any of such Entities</u>

35.     None.

(h)     <u>Premises Owned, Leased or Held Under Other Arrangement from which Debtors Operate their Business</u>

36.     As described above, Lionel owns two buildings located in Chesterfield,

Michigan.  The buildings have an aggregate estimated value of $ 6.6 million.  A mortgage on the

facilities has been granted to the Debtors' prepetition secured lenders as collateral to secure the

Debtors' Prepetition Credit Facility and the Senior Notes.

| Facility Address | Use |
|---|---|
| 26750 Twenty-Three Mile Road Chesterfield, MI 48051-1956 | Corporate Headquarters |
| 50625 Richard W. Blvd Chesterfield, MI 48051 | Warehouse and Distribution Center |

      (i)      <u>Location of (1) Substantial Assets, (2) Books and Records and (3) any</u>
<u>Assets outside of the United States</u>

      37.    <u>Substantial Assets</u>.  Lionel's domestic assets are primarily located in its

warehouse and distribution center in Chesterfield, Michigan. Liontech has no physical assets.

      38.    <u>Books and Records</u>.  The Debtors' books and records are maintained at the

Debtors' headquarters in Chesterfield, Michigan.

      39.    <u>Foreign Assets</u>.  As the Debtors' inventory is manufactured in South

Korea, China and Hong Kong, at any given time a substantial portion of the Debtors' assets—

including the Debtors' tool and die equipment—are located in their manufacturers' plants in

these countries.  The Debtors' primary manufacturers are Sanda Kan (China), Hayge Trading Co.

(South Korea), Drumwell Ltd. (Hong Kong) and Silver Manufactory Holdings (China).  The

estimated value of inventory held by these manufacturers as of the Commencement Date is

approximately $480,000.  The estimated value of the tool and die equipment (based on estimated

replacement value) held by these manufacturers as of the Commencement Date is approximately

$50,000,000.

(j)     Nature and Status of Actions or Proceedings, Pending and Threatened, Against the Debtors or their Property Where a Judgment Against the Debtor or Seizure of the Debtors' Property May Be Imminent

40.     A list of pending and threatened actions against the Debtors is annexed hereto as Schedule D.  The most significant proceeding is the litigation with MTH discussed above in paragraphs 16 through 19.

(k)     Debtors' Existing Senior Management

41.     Jerry Calabrese is the Debtors' Chief Executive Officer.  Mr. Calabrese joined Lionel in September 2004.  Prior to taking this position, Mr. Calabrese owned and headed GSC Marketing, a firm that developed media and marketing programs for sports and entertainment clients including NASCAR, for whom he developed its award winning 50th Anniversary brand, and NBC, with whom he partnered to bring boxing back to network television after an absence of more than two decades.  From 1990-1996 he worked for Marvel Entertainment serving as head of its consumer products division, foreign publishing and licensing operation, and finally as President of Marvel Comics Group.  During his tenure, he oversaw the development and exploitation of a half-dozen popular network and syndicated kids' television shows and increased non-publishing revenue from $3 million in 1991 to almost $100 million ins 1995.  In the 1980's Mr. Calabrese was a consumer magazine owner and publisher and helped pioneer ancillary brand development for magazines, as well as "selectronic" bindery techniques with GAMES Magazine.

42.     Mark Erickson is the Debtors' Vice President, New Business Development and is responsible for overseeing the company's consumer marketing activities, public relations efforts, and licensing functions.  Prior to joining Lionel in September 2004, Mr. Erickson worked with Mr. Calabrese at GSC Marketing and, before that, at Marvel Entertainment.  At GSC Marketing he helped create and exploit NASCAR's 50th Anniversary

program which generated more than 200 hours of non-race television programming, and an impressive list of new promotional sponsors and licensees.  At Marvel, he oversaw all consumer marketing and public relations functions, in addition to the marketing services area that supported all publishing sales, advertising sales, licensing and promotion efforts.

43.    Michael Braga is the Debtors' Director of Consumer Services and provides leadership to the Product Repair/Technical Services Center, the Customer Care Center (product forecasting, parts sales, customer calls/e-mails), the Direct Sales Call Center, and Lionel Web Site/Store. In addition, Mr. Braga coordinates the production of Lionel club/specialty cars and provides direction to the network of nearly 400 Authorized Lionel Service Stations.  Mr. Braga has been with Lionel for 31 years.  He has served as Assistant Foreman, Production Control; Receiving Department Supervisor; Materials Department Supervisor; Master Scheduler/Planner; New Products Coordinator; and Marketing Product Manager.

44.    LuAnn Crowley is the Debtors' Vice President, International Operations. Ms. Crowley joined Lionel in September 1997 as a Project Manager in the Engineering Services Department.  As Lionel was moving its manufacturing overseas in 2001, Ms. Crowley was promoted to the position of Director of Offshore Manufacturing with the responsibility of coordinating the overseas manufacturing of Lionel's product line with various vendors.  In 2002, Ms. Crowley was promoted to the position of Vice President, International Operations.  Prior to joining Lionel, Ms. Crowley worked for G.E. Appliances as a Manufacturing Operations Engineer.  Before that she worked for McDonnell Douglas Aerospace as a Senior Engineer.  Ms. Crowley earned a Master of Business Administration Degree and a Bachelor of Science Degree in Mechanical Engineering, both from the University of Alabama.

45.    Timothy Dooley is the Debtors' Logistics Manager. Mr. Dooley re-joined

Lionel in June 1998 as the Scheduling/Planning Manager in charge of scheduling the domestic

manufacturing in Michigan.  When manufacturing was moved overseas in 2001, Mr. Dooley

transferred to the position of Logistics Manager, where he overseas all aspects of distribution and

materials.  Prior to re-joining Lionel, Mr. Dooley held positions of  Plant Manager at Vaungarde,

Inc. and Materials Manager at Sherwood Division - Hypro Corporation. Mr. Dooley has also

served as Manufacturing Systems Manager for Aeroquip, a tier one auto supplier.  Mr. Dooley's

career at Lionel began in 1989 when he was hired as the Production Control Manager.  In this

capacity, he was responsible for manufacturing production schedules and developing capacity

planning reports.  Mr. Dooley attended Eastern Michigan University and the University of

Miami (Ohio).

> 46.     Robert Ryder is the Debtors' Vice President, Sales.  Mr. Ryder joined

Lionel in December 1989 as Director of Human Resources, where he gained a tremendous

amount of experience with Lionel and the model railroad industry.  In September 1992, Mr.

Ryder was promoted to the position of Director of Sales Admin./Visitor's Center.  In June 1996,

Mr. Ryder was promoted to the position of National Sales Manager.  Mr. Ryder was promoted to

his current position of Vice President of Sales in January 1998.  Prior to joining Lionel, Mr.

Ryder had worked in the health care industry in a variety of positions including, Director of

Human Resources and Assistant Director, Personnel/Labor relations.  Mr. Ryder earned a Master

of Arts in Business Management and Supervision from Central Michigan University and a

Bachelor of Arts from Oakland University.

> 47.     Scott Turkington is the Debtors' Chief Financial Officer.   Mr. Turkington

has, on a cumulative basis, been with Lionel for eleven years.  Mr. Turkington re-joined Lionel

in January 1998 as the company's Controller.  Mr. Turkington was promoted to the position of

Vice President, Finance/Chief Financial Officer, where he is responsible for and oversees the accounting, finance, and MIS functions.   Prior to re-joining Lionel, Mr. Turkington held the positions of Financial Analyst, Controller and General Manager with other firms.  Mr. Turkington's career with Lionel began in August 1987 where he served as the Senior Financial Analyst.  His responsibilities at that time included supervising the financial analysis staff, developing financial plans and forecasts, developing comprehensive financial models and strategic business plans, and implementing a new G/L system.  Mr. Turkington holds a Bachelor of Science in Business Administration from the University of Detroit with a major in Finance.

      (l)      <u>Estimated Payroll and Payments to Financial Consultant in the First 30 Days of Chapter 11 Cases</u>

48.      In the 30 days following the Commencement Date, the Debtors' total payroll to hourly and salaried employees (excluding officers and directors) is expected to be $388,000 (excluding any overtime).

49.      In the 30 days following the Commencement Date, the total estimated amount to be paid to officers and directors of the Debtors is $41,000.

50.      In the 30 days following the Commencement Date, the total estimated amount to be paid to the Debtors' financial consultant, Conway, Del Genio, Gries, & Co., LLC, is $80,000 (subject to approval by the Court).

      (m)      <u>Schedule of Estimated Cash Receipts and Disbursements, Net Cash Gain or Loss, Obligations and Receivables Expected to Accrued but not be Paid, excluding Professional Fees</u>

51.      See Schedule E attached hereto.

I declare under penalty of perjury that the foregoing is true and correct and that this

Affidavit was executed on the ___9___ day of November, 2004.

By: Scott Turkington

Title:  Chief Financial Officer of Lionel L.L.C.
        and Liontech Company

Subscribed and Sworn to before me,

this the _9th_ day of November, 2004.

Notary Public

My Commission Expires: June 26, 2007

MARILYN R. KRYSCYNSKI
NOTARY PUBLIC MACOMB CO., MI
MY COMMISSION EXPIRES Jun 26, 2007

Schedule A – 20 largest unsecured claims

## LIST OF CREDITORS WITH
## LARGEST UNSECURED CLAIMS

Lionel L.L.C. and Liontech Company hereby files a consolidated list of its largest unsecured creditors, based on its books and records as of approximately October 31, 2004 (the "Top 20 List").  The Top 20 List was prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in the Debtor's chapter 11 case.  The Top 20 List does not include:  (1) persons who fall within the definition of "insider" set forth in 11 U.S.C. § 101; or (2) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 20 largest unsecured claims.  The information presented in the Top 20 List shall not constitute an admission by, nor is it binding on, the Debtors.  The failure of the Debtors to list the claim as contingent, unliquidated or unknown does not constitute a waiver of the Debtors' right to contest the validity, priority, and/or amount of the claim.

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS INCLUDING ZIP CODE | NAME AND COMPLETE MAILING ADDRESS INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OF DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM WHO MAY BE CONTACTED | NATURE OF CLAIM (TRADE DEBT, BANK LOAN, GOVERNMENT CONTRACT, ETC.) | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED OR SUBJECT TO SET-OFF | AMOUNT OF CLAIM [IF SECURED ALSO STATE VALUE OF SECURITY] |
|---|---|---|---|---|
| 1.  MTH Electric Trains<br>7020 Columbia Gateway Dr.<br>Columbia, MD 21046 | Mike Wolf<br>Phone: 410-381-2580<br>Address:<br>MTH Electric Trains<br>7020 Columbia Gateway Dr.<br>Columbia, MD 21046 | Judgment | Disputed | $40,775,665 |
| 2.  Sanda Kan<br>1-7 Kwai Cheong Road<br>1st Floor, Kwai Chung<br>New Territories,<br>HONG KONG | Paul Chu<br>Fax: 852-2480-4702<br>E-mail:<br>paulchu@hksandakan.com<br>Address:<br>Sanda Kan<br>1-7 Kwai Cheong Road<br>1st Floor, Kwai Chung<br>New Territories,<br>HONG KONG | Trade | | $6,685,259.85 |
| 3.  Guggenheim Investment Management<br>135 East 57th Street<br>New York, NY 10022 | Adrian Duffy<br>Fax: 212-644-8396<br>Address:<br>Guggenheim Investment Management<br>135 East 57th Street<br>New York, NY 10022 | Notes | | $5,324,000 |

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS INCLUDING ZIP CODE | NAME AND COMPLETE MAILING ADDRESS INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OF DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM WHO MAY BE CONTACTED | NATURE OF CLAIM (TRADE DEBT, BANK LOAN, GOVERNMENT CONTRACT, ETC.) | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED OR SUBJECT TO SET-OFF | AMOUNT OF CLAIM [IF SECURED ALSO STATE VALUE OF SECURITY] |
|---|---|---|---|---|
| 4.   Dykema Gossett PLLC 39577 Woodward Avenue Suite 300 Bloomfield Hills, MI  48304 | Luanne Teller Fax: 248-203-1763 E-mail: lteller@dykema.com Address: Dykema Gossett PLLC 39577 Woodward Avenue Suite 300 Bloomfield Hills, MI 48304 | Professional Services | | $1,774,249.50 |
| 5.   Conway MacKenzie & Dunleavy, P.C. 401 S. Old Woodward #340 Birmingham, MI  48009 | Pat Dunleavy Fax: 248-433-3143 E-mail: pdunleavy@c-m-d.com Address: Conway MacKenzie & Dunleavy, P.C. 401 S. Old Woodward #340 Birmingham, MI  48009 | Professional Services | | $162,110.07 |
| 6.   Hagye Trading Co. Inc. 630-24 Chang-Dong Dobong-Ku SEOUL, KOREA  132-921 | Mr. Cho Fax: 82-2-906-7710 Phone: 434-977-9864 E-mail: hgt001@hanafos.com Address: Hagye Trading Co. Inc. 630-24 Chang-Dong Dobong-Ku SEOUL, KOREA  132-921 | Trade | | $31,930.00 |
| 7.   Right Management Conslts. 40 Oak Hollow Ste. 210 Southfield, MI  48034 | Meredith Krupic Phone: 248-948-1600 Address: Right Management Conslts. 40 Oak Hollow Ste. 210 Southfield, MI 48034 | Trade | | $11,000.00 |
| 8.   Proguard Security Service P.O. Box 1396 Troy, MI  48099-1396 | Kevin Straub Fax: 586-254-7321 Address: Proguard Security Service P.O. Box 1396 Troy, MI  48099-1396 | Trade | | $9,133.71 |

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS INCLUDING ZIP CODE | NAME AND COMPLETE MAILING ADDRESS INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OF DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM WHO MAY BE CONTACTED | NATURE OF CLAIM (TRADE DEBT, BANK LOAN, GOVERNMENT CONTRACT, ETC.) | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED OR SUBJECT TO SET-OFF | AMOUNT OF CLAIM [IF SECURED ALSO STATE VALUE OF SECURITY] |
|---|---|---|---|---|
| 9.  Advance Freight Traffic Service, Co. P.O. Box 129 Hazel Park, MI  48030 | Jeff Bogden Phone: 248-542-8989 Address: Advance Freight Traffic Service, Co. P.O. Box 129 Hazel Park, MI  48030 | Trade | | $6,979.23 |
| 10.  FedEx P.O. Box 371461 Pittsburgh, PA  15250-7461 | Fax: 800-548-3020 Address: FedEx P.O. Box 371461 Pittsburgh, PA  15250-7461 | Trade | | $6,442.33 |
| 11.  Detroit Legal 450 West Fort Street Detroit, MI  48226 | Kay Manecke Phone: 313-962-4020 Fax: 313-962-6331 Address: Detroit Legal 450 West Fort Street Detroit, MI  48226 | Trade | | $5,904.20 |
| 12.  Christmas Northeast 1028 E. Main Street P.O. Box 167 Palmyra, PA  17078 | Michael Ross Phone: 717-838-9446 Address: Christmas Northeast 1028 E. Main Street P.O. Box 167 Palmyra, PA  17078 | Trade | | $4,417.95 |
| 13.  Ryan Polishing Corp. 10709 Capital Ave. Oak Park, MI  48237 | Chuck Holmes Phone: 248-548-6832 Fax: 248-548-7458 Address: Ryan Polishing Corp. 10709 Capital Ave. Oak Park, MI  48237 | Trade | | $3,046.83 |
| 14.  Kalmbach Publishing P.O. Box 2902 Milwaukee, WI  53201-2902 | Nanette Fax: 262-798-6640 Address: Kalmbach Publishing P.O. Box 2902 Milwaukee, WI  53201-2902 | Trade | | $2,952.05 |
| 15.  Coverall North America 13233 Collections Ctr. Dr. Chicago, IL  60693 | Jane Fell Fax: 248-349-6590 Address: Coverall North America 13233 Collections Ctr. Dr. Chicago, IL  60693 | Trade | | $2,860.00 |

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS INCLUDING ZIP CODE | NAME AND COMPLETE MAILING ADDRESS INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OF DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM WHO MAY BE CONTACTED | NATURE OF CLAIM (TRADE DEBT, BANK LOAN, GOVERNMENT CONTRACT, ETC.) | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED OR SUBJECT TO SET-OFF | AMOUNT OF CLAIM [IF SECURED ALSO STATE VALUE OF SECURITY] |
|---|---|---|---|---|
| 16.  SBC<br>Bill Payment Center<br>Saginaw, MI  48663-0001 | Address:<br>SBC<br>Bill Payment Center<br>Saginaw, MI  48663-0001 | Trade | | $2,481.63 |
| 17.  Office Express<br>40622 Mound Road<br>Sterling Heights, MI 48310 | Gary Carr<br>Fax: 586-795-2900<br>Address:<br>Office Express<br>40622 Mound Road<br>Sterling Heights, MI 48310 | Trade | | $2,332.29 |
| 18.  Robot Printing and Communications<br>12085 Dixie<br>Redford, MI  48239 | Ed Duffy<br>Fax: 313-255-0470<br>Address:<br>Robot Printing and Communications<br>12085 Dixie<br>Redford, MI  48239 | Trade | | $2,272.64 |
| 19.  Sprint<br>P.O. Box 88026<br>Chicago, IL  60680-1206 | Rick Conn<br>Fax: 800-448-1112<br>Address:<br>Sprint<br>P.O. Box 88026<br>Chicago, IL  60680-1206 | Trade | | $2,177.68 |
| 20.  United Parcel Service<br>Lockbox 577<br>Carol Stream, IL  60132-0577 | Address:<br>United Parcel Service<br>Lockbox 577<br>Carol Stream, IL  60132-0577 | Trade | | $1,657.00 |

Schedule B – Largest Secured Claims

| Creditor | Amount of Claim | Description and Value of Collateral | Disputed Claim or Lien |
|---|---|---|---|
| PNC Bank, as agent for the Lenders under Prepetition Credit Agreement<br><br>Address:<br>PNC Agency Services<br>One PNC Plaza<br>249 Fifth Avenue<br>Pittsburgh, PA 15222 | Principal amount of approximately $31 million | First lien on substantially all of the Debtors' assets.<br><br>Estimated value:<br>not less than $50 million | |
| Guggenheim Investment Management, as Agent for the holders of the Senior and Junior Notes<br><br>Address:<br>135 East 57th Street<br>New York, NY 10022 | Approximately $12,568,000 | Second lien on substantially all of the Debtors' assets.<br><br>Estimated Value:<br>not less than $50 million | |

Schedule C – Balance Sheet

**Lionel LLC**
**Balance Sheet**
**October 31, 2004**
**$000's**

| | |
|---|---:|
| Current Assets | |
| Cash | (579) |
| Inventory (net) | 8,898 |
| Prepaid Expenses | 705 |
| Accounts Receivable (net) | 15,944 |
| Deposits on Inventory | |
| Deferred Charges - Current | |
| Total Current Assets | 24,968 |
| | |
| Net Fixed Assets | 13,484 |
| Deposits on Tooling | |
| Goodwill | 2,812 |
| Patents | 191 |
| Deferred Charges | 952 |
| Total Assets | 42,407 |
| | |
| Current Liabilities | |
| Revolving Credit Facility | 23,685 |
| Accounts Payable | 9,366 |
| Other Current Liabilities | 2,629 |
| Total Current Liabilities | 35,680 |
| | |
| Long Term Debt | |
| Term Loan | 6,825 |
| Guggenheim $7.0 Mill Note 1 | 7,111 |
| Guggenheim $5.0 Mill Note 2 | 5,324 |
| Total Long Term Debt | 19,260 |
| | |
| Total Liabilities | 54,940 |
| | |
| Owners Equity | (12,533) |
| | |
| Total Liabilities & Equity | 42,407 |

Schedule D - Pending and Threatened Litigation Actions

| Pending Actions | Nature/Status of Action |
| --- | --- |
| Mike's Train House, Inc. v. Lionel, case no. 00-CV-71729 (Eastern District of Michigan) | Judgment in the amount of $40.8 million entered on November 3, 2004. |
| Walker v. Lionel | Class action suit seeking damages in an undetermined amount. |
| Various Workers' Compensation suits | Various |
| Union Pacific Railroad Company v. Lionel L.L.C. and Athearn Inc., case no. 8:04-CV-249 (District of Nebraska) | Lawsuit against Company for Company's alleged use of Union Pacific trademarks without consent. Company currently negotiating to enter license agreement with Union Pacific. Court has granted two extensions, and Company is applying for third extension. |

| Threatened Actions | Assessment of Claim |
| --- | --- |
| Mike's Train House has threatened to file a patent infringement suit against Lionel and has issued a cease and desist letter. | Debtors believe their patent predates MTH's patents and that the claim is therefore meritless. |
| CSX has threatened to sue Lionel for use of its trademarks and tradenames. | Debtors believe these claims are meritless. |

Schedule E - Statement of projected receipts and disbursements for first 30 days of the cases

**Lionel, LLC**

Cash Forecast

|  | *For the week ending:* | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | **21-Nov** | **28-Nov** | **5-Dec** | **12-Dec** | **19-Dec** | **26-Dec** | **2-Jan** | **Total** |
| **Cash Collections** | | | | | | | | |
|  | 1,250 | 723 | 1,275 | 1,190 | 3,316 | 1,785 | 1,014 | 10,554 |
| **Expenditures** | | | | | | | | |
|  | 995 | 1,292 | 823 | 682 | 634 | 1,345 | 1,391 | 7,162 |
| **Cash Flow** | $ 255 | $ (569) | $ 452 | $ 508 | $ 2,682 | $ 440 | $ (377) | $ 3,392 |
| **Cumulative Cash Flow** | | $ (314) | $ 138 | $ 647 | $ 3,328 | $ 3,769 | $ 3,392 | |